■ In the Matter of MICHAEL B. CATHOLIC CHILD CARE SOCIETY OF THE DIOCESE OF BROOKLYN et al., Respondents; MAGGIE W. L., Intervenor-Appellant; LENORE GITTIS, as Law Guardian on Behalf of the Child, Appellant.—In a proceeding pursuant to Social Services Law § 384-b to terminate parental rights, the Law Guardian and the intervenor separately appeal from an order of the Family Court, Kings County (Pearce, J.), dated October 7, 1991, which, after a hearing, awarded custody of the child to the respondent, the natural father of the child.

Ordered that the order is reversed, on the law and the facts and as a matter of discretion, without costs or disbursements, the appellant foster mother and her husband Quintin L. are

awarded custody of the child in accordance herewith, and the matter is remitted to the Family Court, Kings County, for a hearing and determination before a different Judge with respect to the father's visitation rights.

The subject of this proceeding is six-year-old Michael B., who was born with a positive toxicology for cocaine. Immediately after his birth, Michael was voluntarily placed in foster care by his natural mother, who is now deceased. Michael continually resided with his foster parents until December 14, 1990, when, pursuant to an order of the Family Court which denied the petitioner's request for a best-interests hearing, he was discharged to his natural father. Michael has been in his natural father's custody since December 14, 1990, and to date has had no contact with his foster parents.

On March 18, 1991, this court reversed the finding of the Family Court that "extraordinary circumstances" were present and we directed that a best interests hearing be held within 20 days to consider, among other things, the impact that a change in custody would have on Michael, in view of the bonding which had occurred between him and his foster parents, who had raised him since infancy *(see, Matter of Michael B.,* 171 AD2d 790). On October 7, 1991, two months after the conclusion of the best-interests hearing, the Family Court issued the order appealed from awarding custody of Michael to his natural father. We now reverse.

Contrary to the conclusion reached by the Family Court, the evidence presented at the hearing compels a finding that the best interests of the child will be served by awarding custody of him to his foster parents.

Any custody determination depends to a great extent on the court's assessment of the credibility of witnesses and on the character and temperament of the parents; thus, the findings of the hearing court are generally accorded great respect *(see, Matter of Robert T. F. v Rosemary F.,* 148 AD2d 449; *Eschbach v Eschbach,* 56 NY2d 167; *see also, Matter of Irene O.,* 38 NY2d 776). However, the authority of the Appellate Division in matters of custody is as broad as that of the hearing court *(see, Matter of Robert T. F. v Rosemary F., supra; Matter of Louise E. S. v W. Stephen S.,* 64 NY2d 946), "and we would be seriously remiss if, simply in deference to the findings of the hearing court, we allowed a custody determination to stand where it lacked a sound and substantial basis in the record" *(Matter of Robert T. F. v Rosemary F., supra,* at 450; *Matter of Gloria S. v Richard B.,* 80 AD2d 72). In the present case, the

Family Court's determination to award custody of Michael to his natural father must be reversed as lacking a sound and substantial basis in the evidence presented.

The evidence adduced at the hearing overwhelmingly demonstrates that Michael's foster parents are better able than his natural father to provide for his physical, emotional, and intellectual needs. Indeed, with the exception of one supervisor from the petitioner Catholic Child Care Society of the Diocese of Brooklyn, whose involvement in this case was fairly recent, every other individual connected with the case in some official capacity who testified at the hearing opined that Michael's interests would be best served by allowing him to return to his foster family.

Reports prepared by a psychiatrist and psychologist in 1989 and 1990 prior to Michael's discharge to his natural father indicated that his removal from his foster home could be detrimental to and have a serious negative impact on his emotional well-being. Michael's current therapist, Mr. Denis Falco, a clinical social worker and licensed psychotherapist who testified at the best interests hearing, opined that Michael had regressed since living with his father. Mr. Falco also expressed his reservations that Michael and his natural father would ever bond with one another.

Dr. Michael Sullivan, an independent psychologist appointed by the Family Court to evaluate the parties, concluded, after a fairly detailed examination of Michael, his natural father and the foster parents, that the father's "current parenting of Michael could verge on the border of constituting a recordable suspicion of child neglect", and he recommended that Michael be returned to his foster parents' care.

Dr. Sullivan, Mr. Falco, and another caseworker from the petitioner who had been involved with this case since its inception testified that the foster parents had provided Michael with exceptional, loving care enabling him to overcome certain developmental problems which stemmed from his drug addiction at birth. Dr. Sullivan's evaluation of the parties led him to conclude that there was no contest between the foster parents and Michael's natural father in terms of parenting ability.

Michael's father saw him, at most, two or three times during the first three years of his life. After the petitioner moved to terminate his parental rights in 1987 and the Family Court determined in 1988 that he had substantially complied with the terms of the suspended judgment entered in

1987, weekly visitation at the petitioner's offices commenced. On September 26, 1990, when the Family Court declined to hold a best interests hearing before determining the issue of custody, it directed that Michael be discharged to his father within 60 days and that overnight weekend visitation begin immediately. On December 14, 1990, Michael was discharged to his father. He has had no communication with his foster parents since.

At the best-interests hearing, Michael's father openly admitted that he does not discuss and has never discussed Michael's change of living arrangements with him, leaving it to his therapist, whom Michael is supposed to see on a weekly basis. However, of the 30 sessions Michael should have had with his therapist since he began living with his father, he has missed 13. The record also demonstrates that Michael had missed 18 days of school between January and June of 1991 since being in his father's care. Moreover, Michael's father failed to bring him to appointments he had made with Dr. Sullivan, including those which were rearranged to accommodate him at a time when he knew his actions were being scrutinized.

Additionally, while Michael's father testified at the hearing that he had never been fired from any job, a letter from the nursing home where he was employed during the time that the suspended judgment was in effect indicated that he had been discharged because of lateness and absenteeism. Michael's father has not been employed since that time.

Testimony given by Dr. Sullivan and Mr. Falco also suggests that Michael may have been beaten and/or whipped. In this regard, both Dr. Sullivan and Mr. Falco testified that the behavior Michael exhibited during their therapy sessions with him were characteristic of the symptoms which would appear in a child who was being abused. Furthermore, they both described Michael as depressed and sad. In stark contrast, the information pertaining to Michael while he was in the care of his foster parents was positive and reassuring.

In light of the lengthy period of time during which Michael resided with and psychologically bonded to his foster parents and given the potential for emotional as well as physical harm to Michael should permanent custody be awarded to his natural father, we find that the requisite extraordinary circumstances are present (see, Matter of Bennett v Jeffreys, 40 NY2d 543, 545), and conclude that the best interests of this child will be served by allowing him to return to his foster parents.

In view of the testimony presented during the best interests hearing, this court concludes that Michael's natural father is incapable of giving him the emotional support so vital to his well-being *(see, Matter of Bennett v Marrow,* 59 AD2d 492). The testimony presented by Dr. Sullivan and Mr. Falco indicated that an emotional void still existed between Michael and his father despite the eight to nine months during which they resided together prior to the best interests hearing and that this void showed no signs of being bridged.

Accordingly, based upon the totality of the testimony and upon a consideration of all the factors herein including the recommendations of the court-appointed psychologist, Michael's therapist, and Michael's Law Guardian regarding the father's deficient parenting abilities, we conclude that the order of the Family Court must be reversed. Custody of Michael is awarded to his foster parents pursuant to Social Services Law § 392 (6) (b), which permits a court to enter an order of disposition directing, *inter alia,* that a child, whose custody and care have temporarily been transferred to an authorized agency, be placed in the custody of a suitable person or persons.

We remit the matter to the Family Court, Kings County, before a different Judge for a hearing to determine the father's visitation rights. Bracken, J. P., O'Brien, Ritter and Copertino, JJ., concur.